**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-1395

ROCHELLE ORLANDO,

      Plaintiff,

v.

TOWN OF FIRESTONE, in its official capacity,

      Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Rochelle Orlando, by and through her attorney, Tiffany J. Drahota of DRAHOTA DEFENSE LLC respectfully brings this Complaint and Jury Demand. In support thereof, Ms. Orlando states the following:

### INTRODUCTION

Ms. Orlando alleges that she was discriminated against on the basis of her sex, subjected to sexual harassment and quid pro quo sexual harassment, and retaliated against by the Town of Firestone, former Chief of Police David Montgomery and former Corporal Chris Ross of the Firestone Police Department while Ms. Orlando was employed by the Town of Firestone as a Community Service Officer from February 25, 2019, until her forced resignation on June 8, 2020. Ms. Orlando brings this Complaint and Jury Demand pursuant to Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), which makes it unlawful for "an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such

1

individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Plaintiff Orlando was participating in a training program within the meaning of 42 U.S.C. 2000(d) and was discriminated against on the basis of her sex throughout the training program.

## JURISDICTION AND VENUE

1.      Jurisdiction over these claims is conferred upon this Court pursuant to 28 U.S.C. § 1331 and § 1343(a)(3), and this case is brought pursuant to 42 U.S.C. 2000(e) *et. seq.*

2.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State of Colorado at all relevant times stated herein.

3.      Plaintiff timely filed her Charge of Discrimination with the Equal Employment Opportunity Commission on September 15, 2020.

4.      The matter was investigated by the EEOC but no formal findings were made.

5.      On February 18, 2022, Plaintiff Orlando, through counsel, requested in writing a Right to Sue letter.

6.      On May 4, 2022, Plaintiff Orlando received her Right to Sue Notice from the Department of Justice and timely filed this lawsuit.

## PARTIES

7.      At all times relevant to this Complaint, Rochelle Orlando was a citizen of the United States of America and resident of the State of Colorado.

8.      Defendant Town of Firestone is a political subdivision of the State of Colorado. At all times relevant to this Complaint, Defendant Town of Firestone and

its agents and employees were acting within the scope of their official duties and employment, under color of state law.

## FACTS

9.      Plaintiff Orlando was hired by the Town of Firestone as a Community Service Officer on February 25, 2019.

10.      Her starting salary was approximately $20.00 per/hour with significant health benefits.

11.      At the time she was hired, Plaintiff Orlando was pursuing a bachelor's degree in Criminal Justice with an emphasis in Forensic Investigation at Colorado State University Global.

12.      Plaintiff Orlando believed that if she continued studying and completed her formal education and coupled her education with her workplace experience with the Firestone Police Department, she could achieve her dream job of working as a Crime Scene Investigator.

13.      At the time of hire, Ms. Orlando made it clear to Chief David Montgomery that she was interested in pursuing a career in crime scene investigation.

***Evidence of the Discriminatory, Hostile and Harassing Culture within the Firestone Police Department and the Town of Firestone***

14.      As is often the case when someone begins employment with a new employer, it takes time to understand the culture therein.

15.      Although the Town of Firestone has an anti-discrimination policy in place, the culture within the police department is highly discriminatory and harassing towards women.

16.     The Department was first placed on notice of its discriminatory and harassing environment towards women over thirteen years ago. A written complaint from an individual employed by the Firestone Police Department in 2008 set forth the following concerns:

**Firestone Employees' Comments Documented 13 Years Ago**

1. Employee produced a document written in 2008 that details most of the same concerns that employees have today, including inconsistent promotional processes, policies, policy followed inconsistently, inconsistent discipline, retaliatory actions against employees who express their opinions.

2. The hiring process seems to be inconsistent. Some applicants are made to complete the entire process, while others apparently skip portions. I believe all officers should be made to take all steps in hiring process no matter their level of experience.

3. The promotion process also seems to be unclear. Sometimes people are simply appointed a new position, and other times there is an extensive testing process. Once again, there is not consistency in a very important process.

4. The policies and procedures are unclear at times. There are often references to our department's "unwritten' policies. The enforcement of these policies and procedures also seem to be enforced somewhat inconsistently.

5. Treatment of officers is also varied. Some officers receive what is perceived as preferential treatment. Some are openly admonished by command staff, while others receive no repercussions for repeated poor decision-making. This is also somewhat gender-based with female officers being treated differently.

17.     Despite being put on notice of its discriminatory and harassing culture, the Town of Firestone did nothing to address the issues within the police department.

18.     At the time that Plaintiff Orlando was hired, it was well known within the police department that Chief Montgomery maintained a culture where female employees were routinely subjected to sexual harassment by male employees.

19.     During Plaintiff Orlando's short employment, she observed multiple instances of sexual harassment within the workplace.

4

20.     For example, Lieutenant Yoder once made sexually derogative comments about the Town Manager's assistant, stating, "If Raylynn would get off of her knees in front of A.J. and wipe the cum out of her eyes maybe she would see what's going on."

21.     Despite making this statement in front of numerous female employees, including Plaintiff Orlando, and the statement being reported to Chief Montgomery, Chief Montgomery initiated no adverse employment actions or reprimand of Lieutenant Yoder, even though he admitted to making the derogatory statement.

22.     When a pregnant Firestone citizen complained that the crossing guard on duty was wearing "short shorts," and her husband was looking at the crossing guard's butt, Chief Montgomery joked the complaint away by stating to his employees, including Plaintiff Orlando, "C'mon, I look at her butt too."

23.     Chief Montgomery expressly told Plaintiff Orlando that "if you can't handle the locker room talk, this isn't the job for you." Plaintiff Orlando perceived this to mean that the culture at the department, which was explicitly demeaning and sexually harassing and discriminatory towards women, was not going to change and if Plaintiff Orlando wanted to work and train within the department she had to put up with the discriminatory, harassing and hostile work environment therein.

24.     In addition to the sexually charged comments and derogatory treatment of women within the department, Corporal Ross was alleged to have previously harassed a different female community service officer.

5

25.     Apparently, that female CSO was so uncomfortable that she complained to Chief Montgomery and ultimately quit the job. No actions were taken against Corporal Ross when the other CSO complained of the sexual harassing behavior she was being subjected to on the job.

26.     In fact, Chief Montgomery verified this past incident to Plaintiff Orlando stating at the time of her constructive discharge by rhetorically asking Plaintiff Orlando, "What is it with Chris Ross and CSOs?"

27.     This pervasive culture of sexual harassment and discrimination at the Firestone Police Department against its female employees is condoned, supported, entertained and engaged in by the leadership within the department.

28.     Specifically, Chief Montgomery knew or should have known about the hostile work environment he condoned because a prior female community service officer who worked for him and Corporal Ross had complained about Corporal Ross' behavior and resigned.

29.     Additionally, Corporal Ross' behavior and reputation for sexually harassing female employees within the department was so well known that when Plaintiff Orlando commenced her employment with the Town of Firestone fellow employees were warning her to steer clear of Corporal Ross.

30.     In addition to receiving warnings to steer clear of Corporal Ross, Plaintiff Orlando was told not to speak to Officer Shoemaker because he would inevitably want to show her lewd and explicit videos on his phone.

31.     The structure and makeup of the Firestone Police Department also reflects the discriminatory environment within the Firestone Police Department,

where women were not hired or unable to advance or promote at the same rate and speed as their male counterparts.

32.     At the time of Plaintiff Orlando's employment with the department, there were six (6) female employees and approximately twenty-seven (27) male employees. Of those six (6) female employees, only three (3) were sworn officers.

33.     The majority, if not all, subordinate positions to patrol officers, including CSOs, school resource officers, custodian of records and front desk positions were maintained by women.

34.     The female officers within the police department were referred to as "Chief's Girls" and Chief Montgomery routinely referred to Plaintiff Orlando as "little one."

35.     In general, Chief Montgomery was more affectionate with the female employees, often giving them unsolicited shoulder rubs and hugs.

36.     All leadership positions were given to men and all patrol positions were given to men.

### Plaintiff Orlando Was Subjected to Sexual Harassment and Discrimination by Corporal Ross

37.     Plaintiff Orlando made it known to Corporal Chris Ross that crime scene investigation was her passion and purpose, and that she intended to work towards that position at Firestone or elsewhere in the state.

38.     Throughout Plaintiff Orlando's entire tenure with the Town and Firestone Police Department, Corporal Ross was the only employee within the police department that was qualified to conduct crime scene investigations.

39.     Although Corporal Ross and Plaintiff Orlando both reported to Chief Montgomery, Corporal Ross ranked superior to Plaintiff Orlando and Corporal Ross served as one of Plaintiff Orlando's trainers within the police department.

40.     In fact, Chief Montgomery expressly told Plaintiff Orlando "when you are on a crime scene or in the lab, Chris Ross is your supervisor."

41.     Initially, Corporal Ross resisted the idea of training Plaintiff Orlando in crime scene investigation.

42.     In fact, early on in her tenure with the police department, Corporal Ross approached Plaintiff Orlando and said to her, "I've worked too hard and too long to get where I am to train or help you with crime scene investigation."

43.     Plaintiff Orlando perceived this statement as both an express and implicit threat that Corporal Ross was not going to assist her in training or advancing in her position with the police department.

44.     Despite Corporal Ross's reservations, Chief Montgomery approved Plaintiff Orlando to participate in a Colorado Bureau of Investigation training called Crime Scene Investigation for First Responders.

45.     Plaintiff Orlando successfully completed that training in Pueblo, Colorado on October 16-17, 2019.

46.     Thereafter, Corporal Ross began taking a personal interest in Plaintiff Orlando, her training and her studies.

47.     Plaintiff Orlando welcomed the change in attitude in Corporal Ross and mistakenly believed that Corporal Ross genuinely wanted to help her advance her skills and qualify as a crime scene investigator.

48. Plaintiff Orlando was eager to learn from the only person capable of training her so much so that when Corporal Ross began making flirty comments to Plaintiff Orlando, she ignored them.

49. By the spring of 2020, Corporal Ross permitted Plaintiff Orlando to go on stolen vehicle and burglary investigations with him.

50. He also began taking an intense interest in Plaintiff Orlando's Investigative Forensic Photography class.

51. As other members of the department observed Corporal Ross taking an interest in Plaintiff Orlando, they warned Plaintiff Orlando that Corporal Ross could not be trusted.

52. Plaintiff Orlando was so focused on excelling at work and school that she ignored the warnings of her colleagues and pretended that Corporal Ross' flirting and preoccupation with her was not intensifying, although it was.

53. In early April of 2020, Plaintiff Orlando was summoned to the forensic lab by Corporal Ross under the guise that the two would view some crime scene photos.

54. The forensic lab is located at the Firestone Police Department and both Plaintiff Orlando and Corporal Ross were on duty.

55. As Plaintiff Orlando began looking at the photographs, Corporal Ross grabbed her and kissed her.

56. Plaintiff Orlando was shocked and did not know what to do. Before she could say anything, Corporal Ross said to her, "I'm glad you didn't reject me

because if you did, I wouldn't be able to train you anymore and you would need to leave Firestone police department."

57.     Plaintiff Orlando considered this statement to be an express threat that if she reported Corporal Ross or rejected his advances then he would no longer support her training in a close-knit field where all CSIs tend to know one another; that he would make sure that she lost her job and that he kept his job of eighteen-years; and she would be forced to leave the department on bad terms.

58.     After the initial kiss, Corporal Ross began messaging Plaintiff Orlando, which she made sure to respond to.

59.     On or about May 22, 2020, Chief Montgomery called Plaintiff Orlando and Corporal Ross into his office because he had received a complaint that the two were spending too much time together.

60.     Plaintiff Orlando was unilaterally punished based upon her sex and Chief Montgomery suspended the Crime Scene Investigators training program shortly thereafter on May 29, 2020.

61.     Corporal Ross, who was engaging in the same behavior that Plaintiff Orlando was accused of, was not punished nor were the terms or conditions of his employment altered in any way.

62.     Thereafter, three times Corporal Ross came to Plaintiff Orlando's house to "assist" her with her homework assignments and to avoid the detection of Chief Montgomery.

63.     The first time that Corporal Ross came to Plaintiff Orlando's home, Plaintiff Orlando's children were present.

64.     Out of earshot of her children, Corporal Ross said to Plaintiff Orlando, "I've had dreams about being in your bed."

65.     No sexual relations were engaged in the first time that he was at her house.

66.     The second time Corporal Ross came to Plaintiff Orlando's home to "help her with her homework," Plaintiff Orlando's children were not at home and Corporal Ross initiated sex with Plaintiff Orlando, and they had sex in her bedroom.

67.     The third time that Corporal Ross came to her home and began initiating sex with her, Plaintiff Orlando's husband learned of the incident and confronted Plaintiff Orlando, which culminated in the Firestone Police Department responding to the Orlando home and requesting that the Weld County Sheriff's Department arrest Mr. Orlando.

68.     When news of the sexual relations between Plaintiff Orlando and Corporal Ross were made known to Plaintiff Orlando's colleagues at the Firestone Police Department, vis a vis Mr. Orlando's very public arrest, Plaintiff Orlando was forced to share with Chief Montgomery intimate details of her encounters with Corporal Ross.

69.     Both Plaintiff Orlando and Corporal Ross were placed on administrative leave.

70.     Upon placing Plaintiff Orlando on administrative leave, Chief Montgomery convinced Plaintiff Orlando to resign saying things like "it would probably be best" and telling her that she should take time to determine whether or not she should come back to the department.

71.     Chief Montgomery also indicated to Plaintiff Orlando that when she came back to the department, she would likely be treated differently because the sexual relationship between Plaintiff Orlando and Corporal Ross was now well known within the department.

72.     In fact, when Plaintiff Orlando was turning in her department-issued gear pursuant to the requirements of her administrative leave, she told Chief Montgomery about Corporal Ross kissing her and that she wished she had reported him then.

73.     On June 8, 2020, and after being placed on administrative leave, Plaintiff Orlando resigned from the Firestone Police Department.

74.     The following factors reasonably influenced Plaintiff Orlando's decision to resign:

   a.  Plaintiff Orlando had been placed on administrative leave and her job responsibilities had been taken away from her;

   b.  Plaintiff Orlando was not permitted to come to work and she reasonably feared that her job was in jeopardy;

   c.  Plaintiff Orlando had been confronted by Chief Montgomery regarding the sexual relationship between Plaintiff Orlando and Corporal Ross, and Chief Montgomery made it known that the scope of the sexual interactions between Plaintiff Orlando and Corporal Ross were being publicly investigated within the Town of Firestone;

   d.  This hardly provided a workplace that was safe for Plaintiff Orlando to return to, especially considering Corporal Ross' prior threats to

Plaintiff Orlando;

e.  Plaintiff Orlando was informed that the Crime Scene Investigation training program had been all but terminated and Plaintiff Orlando would not be able to continue training or working towards the position that she initially sought when she started her employment with the Town of Firestone;

f.  Plaintiff Orlando feared that in the context of the "men's locker room" culture at the Town of Firestone Police Department, Plaintiff Orlando would be subjected to additional harassment and scrutiny as a woman in her position who had engaged in sexual relations with Corporal Ross;

g.  Plaintiff Orlando had previously witnessed other female employees be subjected to derogatory, sexist and sexual comments within the department, and she feared she would become the police department's latest victim of ridicule and sexually harassing remarks;

h.  Plaintiff Orlando continued to fear that if she did not continue to engage in sexual relations with Corporal Ross, he would seek to have her fired from the department. Plaintiff Orlando no longer wanted to engage in sexual relations with Corporal Ross and this was the only way for her to avoid him entirely and ensure that she was not subjected to his advances within the department.

75.  After her constructive discharge from the department, Plaintiff Orlando texted fellow Community Safety Officer Michelle Powers thanking her for

her training and companionship while they were both employed at the Firestone Police Department.

76.     Plaintiff Orlando shared the details of the sexual harassment she endured from Corporal Ross with Ms. Powers.

77.     Ms. Powers reported the incident to the Town of Firestone.

78.     The Town subsequently hired Tim Leary to investigate the sexual harassment and Ms. Orlando participated in an audio-recorded interview on July 15, 2020, with Mr. Leary and Human Resources Analyst Monica Albright.

79.     Plaintiff Orlando filed her Charge of Discrimination with the Equal Employment Opportunity Commission in September of 2020.

80.     On February 17, 2021, and in response to Plaintiff Orlando's Charge, Chief Montgomery was placed on paid administrative leave while the Town of Firestone investigated the allegations raised in Plaintiff Orlando's Charge.

81.     The findings of that investigation have not been provided to Plaintiff or undersigned counsel at the time of the filing of this Complaint.

82.     In April of 2021, the Board of Trustees hired Alan Youngs to conduct an audit and review factors affecting the performance of the Firestone Police Department.

83.     Mr. Youngs' report was made public on September 13, 2021. It can be found at the following link: https://www.firestoneco.gov/656/Firestone-Police-Department-Performance and hyperlink Microsoft Word - Firestone PD-Actions by Chief D. Montgomery- 9-2-2021 (firestoneco.gov) (select Ctrl+ and click on it)

84.     Mr. Youngs' report highlighted the following deficiencies in the Firestone Police Department, both prior to and during Plaintiff Orlando's employment:

a.  Review of past internal affairs complaints show policy was not followed consistently. The chief signed all the performance review (IA) memos.

b.  Discrimination in the promotion process. **(pg. 17)**

c.  Chief Montgomery's failure to supervise led to two internal investigations, which were conducted by the Town. **(pg. 17)**

d.  The following is an example of complaints against Chief Montgomery 13 years ago as to problem areas an individual observed. It is apparent from the interviews conducted with members of the Firestone Police Department that retired Chief Montgomery's bad behavior and misconduct had taken place over a long period of time, but people were afraid to come forward due to the possible loss of their job. **(pg. 17)**

85.     Throughout his investigation, Mr. Youngs detailed that these allegations of misconduct have been going on for years. According to Mr. Youngs at page 18 of his report:

**Firestone Employees' Comments Documented 13 Years Ago**

1. Employee produced a document written in 2008 that details most of the same concerns that employees have today, including inconsistent promotional processes, policies, policy followed inconsistently, inconsistent discipline, retaliatory actions against employees who express their opinions.

2. The hiring process seems to be inconsistent. Some applicants are made to complete the entire process, while others apparently skip portions, I believe all officers should be made to take all steps in hiring process no matter their level of experience.

3. The promotion process also seems to be unclear. Sometimes people are simply appointed a new position, and other times there is an extensive testing process. Once again, there is not consistency in a very important process.

4. The policies and procedures are unclear at times. There are often references to our department's "unwritten' policies. The enforcement of these policies and procedures also seem to be enforced somewhat inconsistently.

5. Treatment of officers is also varied. Some officers receive what is perceived as preferential treatment. Some are openly admonished by command staff, while others receive no repercussions for repeated poor decision-making. This is also somewhat gender-based with female officers being treated differently.

6. Communication is not very good, or open as purported. There is often a subtle retaliation or ramification for expressing concerns, opinions, etc. Command staff is good at telling people what they want to hear. Many times, one person is told one thing, and another person is being told something else on the same issue.

86.     Mr. Youngs made the following recommendations based upon his investigation into the Firestone Police Department shortly after Plaintiff Orlando's constructive discharge:

    a. POIIIs required to take and pass the Standard (sic) front line supervisors test prior to being allowed to supervise. **(pg. 19)**

    b. "Chief points" removed from POIII/Corporal promotion process.

    c. Corporal positions eliminated. **(pg. 19)**

d.  Monthly supervisor training through PoliceOne virtual academy implemented. **(pg. 19)**

e.  Identified supervisors with no documented formal supervisor training. All have been enrolled in one week leadership/supervisor school. **(pg. 19)**

f.  Commander enrolled in 10-week command school. **(pg. 19)**

g.  Four corporals have not passed the Standard National Front Line Supervisors Test (NFLST) which is required by the PD. Allegedly they were given "chief points" after the fact and given corporal rank. This is a bad and unfair practice. With the elimination of the corporal rank the issue of them supervising has been resolved. Only pre-approved POIII officers will be allowed to supervise in the absence of a sergeant. Command staff has been ordered not to allow these four to supervise under the new POIII designation unless they retake the NFLST and receive a passing score. **(pg. 23)**

h.  No standardized internal affairs procedures and no standardized internal affairs forms. The new Lexipol policies regarding conduct and personnel complaints have been issued and signed off by staff. We are in the process of developing the basic procedures needed to conduct an internal affairs investigation that follows the new Lexipol policy. We have an independent investigator starting work March 1, 2021 to walk through a current internal affairs investigation with PD supervisors to teach them the proper procedure. I have developed

and implemented all the appropriate internal affairs forms. I had IT create a professional standards folder with command staff only access on the G drive. All future internal affairs investigations will be located in individual employee sub folders within the professional standards folder. All investigations from this point will have an individual IA number. (pg. 24)

***After Her Constructive Discharge, the Town of Firestone Retaliated Against Plaintiff Orlando and Prevented Her from Securing Additional Police Work***

87.     At the time of her constructive discharge, Chief Montgomery told Plaintiff Orlando that she had a great police-work foundation and that she could use him as a reference as she applied for other positions.

88.     Plaintiff Orlando immediately began applying for other positions around Firestone.

89.     Plaintiff Orlando interviewed for a CSO position in Mead, Colorado, and Plaintiff Orlando indicated that the Chief of Police in Mead could speak with Chief Montgomery.

90.     After the conversation with Chief Montgomery, Plaintiff Orlando was turned down for the CSO position, a position for which she was more than qualified.

91.     Thereafter, Chief Montgomery told Plaintiff Orlando that she needed to go through Human Resources for references.

92.     Plaintiff Orlando was not able to find a job until August of 2020, which was a position as an animal control officer for Larimer Humane Society.

93.     The Larimer position paid $14.00 per/hour and did not have good benefits.

94.     Plaintiff Orlando left that job in January of 2021 because it was costing her family too much money for childcare and commuting expenses.

95.     In August of 2021, Plaintiff began working as a clerk at the Boulder County Courthouse. Her gross pay was $3,500.00 per/month.

96.     This position required Plaintiff Orlando to commute one hour each way.

97.     During this time, Plaintiff realized that she would not be able to obtain a Crime Scene Investigator position within Colorado due to Corporal Ross and the fact that the CSI community is a close-knit community.

98.     Nevertheless, Plaintiff excelled at her studies, graduated from college, took the LSAT and was accepted to the University of Denver School of Law. Plaintiff will begin law school there in the fall of 2022.

99.     Her first year of law school will cost $81,000. During her first year of law school, Plaintiff Orlando will be unable to work.

**FIRST CLAIM FOR RELIEF**
(42 U.S.C. § 2000e et. seq. – Sex Discrimination Based Upon a Hostile Work Environment)

100.    Plaintiff Orlando hereby incorporates all other paragraphs of this Complaint as if set forth herein.

101.    Plaintiff Orlando was discriminated against because she is a female and was a female CSI trainee.

102.    Corporal Ross is heterosexual and therefore directed his pervasive and sexual advances at Plaintiff Orlando because she was a female subordinate to him within the police department.

103.    The discrimination Corporal Ross subjected Plaintiff Orlando to was severe and pervasive, altering the terms and conditions of her employment and creating an abusive working environment.

104.    In his role as her supervisor, Corporal Ross subjected Plaintiff Orlando to severe sexual harassment. Corporal Ross kissed Plaintiff Orlando on the job and threatened her that if she rebuffed his advances, he would have her fired.

105.    Corporal Ross felt empowered to engage in this kind of conduct due to the culture within the Town of Firestone police department wherein, women's bodies were routinely commented upon, women were subjected to extremely derogatory statements and then told that if they could not handle the sexual harassment and discrimination, they would lose their employment.

106.    The Town of Firestone had a duty to prevent and/or promptly correct sexually harassing and discriminating behavior.

107.    The Town of Firestone was on notice of this discriminatory and harassing behavior since 2008 yet did nothing to address the toxic and hostile culture therein.

108.    In fact, the hostile work environment was not only tolerated by Chief Montgomery, but it was promoted by Chief Montgomery and Plaintiff Orlando was given multiple warnings that she was to handle this type of work environment or else lose her ability to train as CSI or lose her employment altogether.

109.    At the time that Chief Montgomery placed Corporal Ross in charge of Plaintiff Orlando, Chief Montgomery, and other members of the police

department, knew that Corporal Ross had previously made unwanted sexual advances towards female trainees. Instead of putting someone else in charge of training Plaintiff Orlando for the position that she so desperately wanted, Chief Montgomery and the rest of the Town of Firestone personnel looked the other way knowing full well that Corporal Ross was likely to make sexual advances towards Plaintiff Orlando, all the while abusing his position of power over Plaintiff Orlando.

110.   Naturally, after witnessing the incident where Lieutenant Yoder inferred that another female employee was "on her knees," Plaintiff Orlando did not feel comfortable telling Chief Montgomery about the Corporal Ross sexual harassment because it was apparent to Plaintiff Orlando that only she, as a female, would suffer the consequences of a complaint, as the male employees within the department were above reproach.

111.   Although the Town of Firestone has an anti-discrimination policy in place, the culture at the police department was sexually discriminatory towards and harassing of women who worked in or with the police department.

112.   The Town of Firestone, the employer, is vicariously liable to Ms. Orlando for the actionable hostile work environment created by Corporal Ross (Ms. Orlando's supervisor), because the supervisor's harassment culminated in a tangible employment act, such as discharge, demotion or undesirable reassignment.

113.   The Town of Firestone failed to exercise any reasonable care to prevent and correct promptly the sexually harassing behavior that Ms. Orlando was subjected to.

114.   Because the Town of Firestone took no action to prevent or correct promptly the sexually harassing behavior that Ms. Orlando was subjected to, Ms. Orlando could not take advantage of any preventive or corrective opportunities because no opportunities were provided by the Town of Firestone.

**SECOND CLAIM FOR RELIEF**
(42 U.S.C. § 2000e et. seq. – Quid Pro Quo Sexual Harassment)

115.   Plaintiff Orlando hereby incorporates all other paragraphs of this Complaint as if set forth herein.

116.   Corporal Ross, as the only Firestone Crime Scene Investigator, had the power to participate in, or refuse to, train Plaintiff Orlando in crime scene investigation.

117.   In order to become a crime scene investigator certified by the state, a number of field hours are required to be logged and in this was the only mechanism through which Plaintiff Orlando was going to be able to log those hours.

118.   Additionally, Corporal Ross, as a senior ranking member with the police department, had a direct line to Chief Montgomery and had the ability to recommend firing, disciplining or promoting Plaintiff Orlando.

119.   Corporal Ross also had the authority to make recommendations concerning Plaintiff Orlando's job performance, which would then be used by Chief Montgomery for promotions and other benefits, including whether Plaintiff Orlando would be permitted to train as a crime scene investigator under Corporal Ross's direct supervision.

120.   Corporal Ross, in his supervisory and superior position of power over

Plaintiff Orlando, clearly told Plaintiff Orlando in no uncertain terms that her position within the Firestone Police Department was contingent upon her not refusing his advances.

121.   The first time Corporal Ross subjected Plaintiff Orlando to this demand for sexual favors was when he kissed her in the lab during business hours while both were on the job and expressly told her that he was glad Plaintiff Orlando had not rebuffed him otherwise he would ensure that she was terminated from the police department.

122.   Upon communicating his direct position of power over Plaintiff Orlando, Corporal Ross began to exploit his position of power over Plaintiff Orlando by coming to her home, grooming her for sex and ultimately engaging in sexual relations with Plaintiff Orlando.

123.   Plaintiff Orlando felt pressured to comply with Corporal Ross' sexual advances based upon his express and implicit threats to her and her reasonable belief that if she rejected his advances not only would she lose her ability to promote to the position of crime scene investigator, but she would lose her job altogether.

124.   The entire police department, but especially Chief Montgomery and Corporal Ross, knew how important it was to Plaintiff Orlando to maintain her position in the police department while she finished her bachelor's degree and of her desire to promote to crime scene investigator.

**THIRD CLAIM FOR RELIEF**
(Constructive Discharge)

125.   Plaintiff Orlando hereby incorporates all other paragraphs of this

Complaint as if set forth herein.

126.   Upon being placed on administrative leave and told that she could not come to work, Plaintiff Orlando was forced to resign from her position with the Town of Firestone.

127.   The Town of Firestone, via Chief Montgomery and Corporal Ross (Plaintiff Orlando's direct supervisors), created working conditions that were so intolerable that a reasonable person in Plaintiff Orlando's position would feel forced to resign.

128.   At the time of Plaintiff Orlando's constructive discharge, Plaintiff Orlando had been placed on administrative leave and her job responsibilities had been taken away from her.

129.   In fact, Plaintiff Orlando was not permitted to come to work. Plaintiff Orlando reasonably feared that her job was in jeopardy.

130.   Plaintiff Orlando had been confronted by Chief Montgomery regarding the sexual relationship between Plaintiff Orlando and Corporal Ross, and Chief Montgomery made it known that the scope of the sexual interactions between Plaintiff Orlando and Corporal Ross were being publicly investigated within the Town of Firestone.

131.   This hardly provided a workplace that was safe for Plaintiff Orlando to return to, especially in light of Corporal Ross' prior threats to Plaintiff Orlando.

132.   Additionally, at the time of her constructive discharge, Plaintiff Orlando was informed that the Crime Scene Investigation training program had been all but terminated and Plaintiff Orlando would not be able to continue training

or working towards the position that she initially sought when she started her employment with the Town of Firestone.

133.    Plaintiff Orlando feared that in the context of the "men's locker room" culture at the Town of Firestone Police Department, Plaintiff Orlando would be subjected to additional harassment and scrutiny as a woman in her position who had engaged in sexual relations with Corporal Ross.

134.    Plaintiff Orlando had previously witnessed other female employees be subjected to derogatory, sexist and sexual comments within the department, and she feared she would become the police department's latest victim of ridicule and sexually harassing remarks.

135.    Finally, Plaintiff Orlando continued to fear that if she did not continue to engage in sexual relations with Corporal Ross, he would seek to have her fired from the department. Plaintiff Orlando no longer wanted to engage in sexual relations with Corporal Ross and this was the only way for her to avoid him entirely and ensure that she was not subjected to his advances within the department.

136.    One, or a combination of these facts, is sufficient to satisfy Plaintiff's burden that a reasonable person in Plaintiff's position would have similarly resigned because the working conditions that Plaintiff Orlando was subjected to were intolerable.

137.    As a result of her constructive discharge, Plaintiff Orlando suffered injuries, damages and losses in the form of lost pay, emotional distress, humiliation and stress.

## FOURTH CLAIM FOR RELIEF
(Retaliation)

138.   Plaintiff Orlando hereby incorporates all other paragraphs of this Complaint as if set forth herein.

139.   Throughout her employment with the Town of Firestone, Plaintiff Orlando was engaged in on-the-job training as a CSI and worked as a Community Safety Officer.

140.   Once an employee complained that Plaintiff Orlando and Corporal Ross were spending too much time together, Plaintiff Orlando was retaliated against and the CSI training program was terminated.

141.   Once Chief Montgomery learned of Plaintiff Orlando and Corporal Ross' sexual relationship, Chief Montgomery placed Plaintiff Orlando on administrative leave and encouraged her to resign from the department with the promise that he would provide references for her.

142.   Thereafter, when Plaintiff Orlando listed Chief Montgomery as a professional reference, she was precluded from being hired from a job for which she was qualified and told that Chief Montgomery would no longer provide professional references on her behalf.

143.   Each time Plaintiff Orlando was subjected to sexual harassment or discrimination, and Chief Montgomery knew about it, Plaintiff Orlando was punished and the terms and conditions of her employment were negatively altered in response to the discrimination and harassment she was subjected to.

144.   As a result, Plaintiff Orlando sustained economic and non-economic injuries, damages and losses.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against the Defendant, and award her all relief allowed by law, including but not limited to the following:

(a) Appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims as allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre-and-post judgment interest at the appropriate lawful rate;

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 2nd day of June, 2022.

Respectfully Submitted,


 /s/ *Tiffany J. Drahota*
tiffany@drahotadefense.com
Drahota Defense LLC
1543 Champa Street Ste 400
Denver, CO 80202
(402) 651-0383